*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 22, 2024

Plaintiff-Appellee,

v

No. 350178
Oakland Circuit Court
LC No. 2018-267313-FC

MARITA GLYNISE TALLEY,

Defendant-Appellant.

Before: O'BRIEN, P.J., and CAVANAGH and SHAPIRO*, JJ.

PER CURIAM.

Defendant appeals as of right her jury-trial convictions of first-degree murder (premeditation), MCL 750.316(1)(a), felon in possession of a firearm, MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant's initial appellate brief raised a variety of ineffective-assistance claims, and this Court, while retaining jurisdiction, granted defendant's motion to remand for a *Ginther*[1] hearing to develop those claims.[2] Following the hearing, the trial court denied defendant's motion for a new trial, and the case now returns to this Court for plenary review. We affirm.

## I. BACKGROUND

Defendant's convictions arise from the shooting death of the decedent, William Spencer Bell, Jr. in the late-night hours of May 11, 2018. Defendant and the decedent were in a relationship for a little over a year before the shooting, and had been living together even longer. According to the decedent's family, shortly before the shooting, the decedent said that he was no longer happy

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] *People v Talley*, unpublished order of the Court of Appeals, issued June 17, 2020 (Docket No. 350178).

---

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

-1-

in his relationship with defendant, and that he wanted to break up with defendant and have her move out.

There was is no dispute that, on May 11, 2018, defendant killed the decedent by shooting him with his own gun. The dispute at trial centered around the circumstances of the shooting. Defendant claimed that she shot the decedent in self-defense following a struggle, while the prosecution's theory was that defendant's killing of the decedent was premeditated, shooting the decedent while he was "dozing off" on the couch.

Defendant called 911 shortly before midnight to report the shooting, but her call got disconnected. When the 911 operator called back, defendant answered, and during the ensuing conversation, there was a loud bang. Defendant explained to the operator that she just shot the decedent again because he was trying to grab the gun. Officers arrived shortly thereafter and detained defendant.

The police then processed the scene. One live, unspent cartridge was found on the floor of defendant's and the decedent's shared bedroom in front of a dresser. A drawer of the dresser was open, and inside was an empty holster and other gun-related items.

The decedent's body was in the living room, which was right next to the home's entrance. The decedent was found in a seated position. Officers could see blood on the decedent's shirt and multiple gunshot wounds to his chest. A gun was found on the couch next to the decedent. Officers saw no signs of a struggle. Eleven spent cartridges were found throughout the living room, including two pinned between the decedent's body and the couch. Officers also found an uncapped, partially-filled water bottle between the decedent's legs. Multiple officers checked the areas surrounding the water bottle to see if they were wet, but they were all dry.

Deputy Robert Charlton, the prosecution's ballistics expert, testified that, when a gun is fired, it ejects the spent cartridge, and "most" spent cartridges get ejected "right and to the back." But Deputy Charlton said that there was no set path that spent cartridges travel and that spent cartridges could hit something or bounce once ejected, so where they were found was just where they happened to land. That said, based on where the spent cartridges were found in this case combined with the trajectory of the gunshot wounds to the decedent, Deputy Charlton could approximate where the shots were fired from. He told the jury where he believed the shots were roughly fired from using a visual aid.

Dr. Bernardino Pacris testified that he performed an autopsy of the decedent's body and identified 11 gunshot wounds,[3] a number of which could have been fatal. Dr. Pacris described one "through-and-through gunshot wound" that traveled through the decedent's "left upper arm, exited on the medial aspect of the left upper arm, reenters into the armpit or left axilla, and then exited on the back of the left armpit, so it's basically downward." Dr. Pacris testified that he did not notice any soot or stippling around any of the gunshot wounds, which suggested to him that the gun was fired from more than two feet away. Dr. Pacris also testified that he tested the decedent

---

[3] Dr. Pacris originally said there was 12 gunshot wounds, but then later corrected the prosecutor that there were 11 gunshot wounds.

for drugs, but the tests revealed only that the decedent's blood alcohol level at the time of his death was .02—the decedent tested negative for all other drugs that Dr. Pacris tested for.

The prosecution also presented the testimony of Edwin Duhart as an other-acts witness. Duhart testified that, in 2011, he met defendant at Grace Centers of Hope and, within a week, the two of them agreed to get a motel room to have sex. Duhart said that the two had sex, went out around the motel for 25 minutes, then returned to the motel room and had sex again. Afterwards, while Duhart was dozing off in the bed, he heard defendant get up, and shortly afterward he felt a "sharp pain in [his] head." When Duhart opened his eyes, he saw defendant standing "over [him] with a brick" in her hand. Duhart ran out of the room screaming and asking defendant why she hit him in the head with a brick, and defendant accused Duhart of raping her. Duhart had to get eight stiches and four staples as a result of the assault.

Defendant, testifying in her own defense, confirmed that she assaulted Duhart because he raped her. Defendant then disputed the decedent's family's characterization of her relationship with the decedent. According to defendant, the decedent was verbally, emotionally, and physically abusive throughout their relationship. She agreed that she and the decedent had told the decedent's parents that they planned to separate but claimed that, afterwards, the decedent was "very aggressive." She also claimed that, in the weeks leading up to the shooting, the decedent "became an alcoholic" and was "drinking consistent[ly]."

She said that, on the day of the shooting, after she got home, she went out to the store and bought "half a gallon of vodka." After she got home, the decedent wanted to run out to get juice to go with the vodka, and he asked defendant to get his gun and make sure it was loaded. Defendant said that she "immediately did as instructed," getting the decedent's gun from the drawer in their shared bedroom and racking it to ensure it was loaded. She then gave the gun and holster to the decedent, who went to the store. When the decedent got back, he gave only the holster to defendant and told her to put it back in the drawer.

Defendant testified that she then made drinks for her and the decedent and began working in the dining room while the decedent began listening to music and watching television in the living room. Defendant claimed that the decedent kept getting up to make himself more drinks, and his demeanor eventually became aggressive and abusive. This was when, according to defendant, she tried to leave, at which point the decedent took out his gun, pointed it at her, and told her that he was going to kill her. Defendant, believing she "was facing imminent death," grabbed the gun and wrestled it away from the decedent. Defendant testified that, as she was starting to walk away with the gun, the decedent "jump[ed] up to attack" her and she "knew right then [she] was facing imminent danger," so she "immediately just aimed the gun and [she] shot, and [she] continued to shoot."

The jury convicted defendant as previously stated. This appeal followed.

## II. INEFFECTIVE ASSISTANCE

Defendant argues that her trial counsel, Richard Taylor, provided ineffective assistance in a variety of ways. Defendant asked for and was granted a *Ginther* hearing to address these claims.

Based on the record developed at that hearing, we agree with the trial court that defendant is not entitled to a new trial based on her claims of ineffective assistance.

## A. STANDARD OF REVIEW

Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and law—the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo. *People v Dixon-Bey*, 321 Mich App 490, 515; 909 NW2d 458 (2017).

## B. LAW

To establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Effective assistance is "strongly presumed," *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012), and the defendant bears the heavy burden of proving otherwise, *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004). "If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *People v Haynes*, 338 Mich App 392, 429-430; 980 NW2d 66 (2021). But any strategy so conceived must be in fact sound, and courts must avoid insulating ineffective assistance "by calling it trial strategy." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014) (quotation marks and citation omitted).

## C. BALLISTICS EXPERT

Defendant first challenges Taylor's failure to hire and present the testimony of a ballistics expert at trial. The lower court concluded that Taylor's performance in this respect was objectively unreasonable because he accepted the findings of the prosecution's ballistics expert after reading his report and reviewing the expert's background. Accepting this conclusion as correct for purposes of this opinion, we agree with the trial court's other conclusion—defendant fails to establish that Taylor's objectively unreasonable performance prejudiced defendant.

Defendant contends that the testimony of her ballistics expert, David Balash, established that defendant was prejudiced by the lack of testimony from a ballistics expert because Balash "would have challenged the State's expert testimony about where [defendant] was standing when she fired the gun" and "the ejection pattern of the cartridges."

In support of the first contention, defendant points to Balash's testimony that Deputy Charlton's opinion about where the shots were fired from based on where the spent cartridges were found was unreliable because Deputy Charlton had not performed the pertinent ejection-pattern test. But Deputy Charlton did not determine where the shots were fired from based on only where the spent cartridges were found; he testified that he considered both where the spent cartridges were found and the trajectory of the gunshot wounds to the decedent to approximately where the

shots were fired from. Balash said that he himself had made similar conclusions based on similar evidence in the past. Balash's opinion that Deputy Charlton's testimony about where the shots were fired from was unreliable was thus based on a misreading of the deputy's testimony—Deputy Charlton said that he approximated where the shots were fired from based on where the spent cartridges were found *and* the trajectory of the gunshot wounds to the decedent, but Balash believed that Deputy Charlton determined where the shots were fired from based only on the placement of the spent cartridges.

For the second contention, defendant takes issue with Deputy Charlton's testimony that spent cartridges normally eject back and to the right, and the testimony of Deputy Robert Koteles that spent cartridges eject back and to the right "99 percent" of the time.[4] But Balash did not seriously dispute this testimony; he in fact agreed that firearms normally eject spent cartridges back and to the right. Balash merely said that spent cartridges can also eject in other ways, and that testing is necessary to determine the specific ejection pattern of a given firearm.

In light of these realities, defendant is simply wrong when she contends that Balash would have challenged Deputy Koteles' and Deputy Charlton's testimony about where the shots were fired from and the ejection patterns of the cartridges. As explained, Balash did not seriously dispute—and even agreed with—the contested portions of the deputies' testimonies.

Regardless, as the trial court recognized, Balash repeatedly indicated that his opinions about Deputy Charlton's testimony were based on the fact that he had not seen evidence that Deputy Charlton had performed certain tests, and Balash unequivocally said that, had the deputy performed those tests, Balash would "take . . . back" his testimony. Balash said that he believed Deputy Charlton "memorialized" his testing in a report, and Balash had simply not seen the deputy's report. In effect, as the trial court rightly observed, Balash was speculating that Deputy Charlton had *not* performed the pertinent tests solely because Balash had not seen a report showing that the tests were completed. Balash caveated this answer further by saying that he believed a report showing whether the tests were completed probably existed. Based on these concessions, the court correctly concluded that, without knowing whether Deputy Charlton's report exists, "[t]here is simply not enough to conclude that there is a reasonable likelihood of a different outcome at trial."

---

[4] We agree with the trial court that it was objectively reasonable for Taylor to not object to Deputy Koteles' testimony about how spent cartridges eject. Deputy Koteles was plainly speaking colloquially when he said that cartridges eject back and to the right "99 percent" of the time—he was not offering the "99 percent" figure as a statistic but as a turn of phrase. It is also obvious that Deputy Koteles was offering the "99 percent" testimony as opinion testimony based on the deputy's experience. Because such testimony was admissible, see *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994), an objection would have been futile, see *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant additionally argues that she is entitled to a new trial based on Balash's testimony challenging Dr. Pacris' opinion that the lack of soot[5] on the decedent meant that defendant shot the decedent from more than two feet away. The trial court rightly recognized that Balash's criticism of Dr. Pacris did not entitle defendant to a new trial because defendant had not established either that (1) Dr. Pacris actually failed to test the decedent's shirt or (2) the lack of such testing (if the shirt was indeed not tested) prejudiced defendant. To the first point, as the trial court noted, nothing in the record suggested that Pacris had *not* tested the decedent's clothing for soot or stippling—no one asked Dr. Pacris. This meant that the court could only speculate about whether such testing occurred. To the second point, as the court noted, even if Dr. Pacris did *not* test the shirt, that failure would only prejudice defendant if defendant could establish that, had Dr. Pacris tested the shirt, he would have found soot or stippling. As the court further noted, defendant did not have the decedent's shirt tested, so the court could only speculate about whether soot or stippling would have been found. Defendant thus failed to establish the factual predicate of her claim. *Haynes*, 338 Mich App at 430.

## D. EXPERT IN DOMESTIC VIOLENCE

Defendant next argues that Taylor provided ineffective assistance by failing to call an expert in domestic violence despite defendant's testimony that the decedent abused her. The trial court concluded that Taylor's decision to not call an expert in domestic violence was objectively reasonable. The court explained that, based on Taylor's testimony, he had adequately investigated the matter by speaking with defendant about the nature of her relationship with the decedent, then researching domestic violence. Only after doing so did Taylor conclude that calling an expert in domestic violence was "unwarranted." The court correctly reasoned that, on this record, it was objectively reasonable for Taylor to not consult an expert in domestic violence.

On appeal, defendant claims that Taylor was ineffective because he "failed to investigate" whether an expert in domestic violence would have supported defendant's theory of the case. This assertion is contradicted by Taylor's testimony that he only concluded that an expert in domestic violence was unwarranted after speaking with defendant and researching case law, reviews, and writings related to battered woman syndrome and domestic violence. The trial court credited this testimony to find that Taylor had investigated whether to consult an expert in domestic violence by discussing defendant's case with her and then researching domestic violence. Defendant has failed to explain how this finding was clearly erroneous, let alone provide record support for her argument that Taylor "failed to investigate" whether to call an expert in domestic violence.

Defendant additionally claims that Taylor "did not provide a strategic reason for not consulting with an expert." But decisions regarding what evidence to present are *presumed* to be matters of trial strategy, and it is defendant's burden to overcome that presumption. *People v*

---

[5] Balash also contested Dr. Pacris' opinion about the stippling on the decedent's body, but the trial court sustained two objections to Balash's stippling testimony due to lack of foundation, and ultimately held that the testimony was inadmissible because defendant never established a foundation for the testimony. Defendant does not challenge the trial court's conclusion that Balash's stippling testimony was inadmissible due to lack of foundation.

*Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004); *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Instead of carrying her burden, defendant tries to evade the burden by contending that the prosecution must provide "a strategic reason" for why Taylor did "not consult[] with an expert" after he spoke with defendant about her relationship with the decedent, researched battered woman syndrome and domestic violence, and concluded that consulting an expert in domestic violence under the circumstances was unwarranted. Defendant's argument clearly does not warrant appellate relief.

Defendant next claims that Taylor "did not explain why an expert was not warranted to testify about an important part of [defendant's] defense." This argument is contradicted by the record. Taylor explained that he decided an expert was not warranted based on discussions with defendant about her relationship with the decedent and his research into domestic violence. If defendant sought a more thorough explanation for why Taylor believed that an expert was unwarranted under the circumstances, she had the opportunity to ask Taylor more probing questions during the *Ginther* hearing. Her decision to not do so does not now entitle her to a new trial. Taylor's explanation on the record as it now stands is sufficient to support the trial court's conclusion that Taylor's decision to not call an expert in domestic violence was objectively reasonable under the circumstances of this case.[6]

## E. MEDICAL EXPERT

Defendant next argues that Taylor provided ineffective assistance by failing to call a medical expert. At trial, it was established that the decedent had epilepsy and that he took anti-seizure medication. The decedent's family testified that the decedent took his medication regularly, yet Dr. Pacris did not find any anti-seizure medication in his system when he died. As part of this Court's remand, we permitted defendant to explore whether her trial counsel was ineffective for not consulting with a medical expert about the effects of the decedent's anti-seizure medication when mixed with alcohol.

Defendant's expert, Dr. Gerald Shiener, was prepared to testify that aggression was a known side-effect of many anti-seizure medications when mixed with alcohol, but the decedent's medication was unknown. Thus, on remand, defendant asked the trial court to conduct an *in camera* review of the decedent's privileged medical records to determine the decedent's epilepsy medication. The trial court denied the request, which led to an interlocutory appeal in which this Court affirmed the trial court's decision.

---

[6] We also agree with the prosecution's argument on appeal that, based on Taylor's testimony at the *Ginther* hearing, it appears that defendant's trial testimony about her relationship with the decedent differed from what she told Taylor initially. Taylor said that, based on his conversations with defendant, "[i]t didn't appear that [the decedent] was abusive." In contrast, defendant clearly testified at trial that the decedent was abusive. Taylor "cannot be found ineffective for failing to pursue information that his client neglected to tell him." *People v McGhee*, 268 Mich App 600, 626; 709 NW2d 595 (2005).

To address whether the trial court properly denied defendant's request for an *in camera* review of the decedent's medical records, the panel applied the following procedure first announced in *People v Stanaway*, 446 Mich 643, 659-650; 521 NW2d 557 (1994), and later incorporated into MCR 6.201(C):

> We hold that where a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an *in camera* review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence, should it be provided to the defendant. [*People v Talley*, unpublished per curiam opinion of the Court of Appeals, issued August 4, 2022 (Docket No. 356518), p 3.]

Doing so, the panel concluded that the decedent's medical records likely contained information relevant to the defense's theory that the mixture of alcohol and the decedent's medication made him aggressive because (1) the decedent's medical records likely contained the name of his prescribed seizure medication, (2) aggression was likely a known side effect of the decedent's prescribed medication, and (3) the decedent more likely than not took his medication on May 11, 2018 (the day he was killed). *Id*. at 4. But the panel concluded that the decedent's medical records were not material and necessary to defendant's defense because

> [a]t most, an expert such as Dr. Shiener could have testified that [the decedent] was on a medication that had the potential to cause aggressive behavior in some patients when mixed with alcohol. In other words, Dr. Shiener would not be able to testify that the combination of the medication and alcohol caused or likely caused [the decedent] to become more aggressive, only that this was a potential side effect. And there was no evidence that his medication, even when mixed with alcohol, had resulted in his becoming aggressive on any prior occasions. [*Id*.]

The panel elaborated that this evidence would not have made defendant's version of events more probable, so admitting the evidence would not have "likely led the jury to a different result." *Id*. at 4-5. The panel opined that the evidence at trial—particularly the evidence of a partially-filled-but-not-spilled, uncapped water bottle between the decedent's legs—made defendant's version of events highly implausible. *Id*. at 5.

When addressing defendant's claim that Taylor was ineffective for not consulting with a medical expert about the effects of mixing alcohol with the decedent's seizure medication, the trial court agreed with this Court's analysis that "Dr. Shiener would not be able to testify that the combination of the medication and alcohol caused or likely caused [the decedent] to become more aggressive—only that this was a potential side effect." The court opined that, in light of this conclusion, assuming that trial counsel was ineffective for not consulting a medical expert about this topic, the deficiency was not outcome determinative.

Arguing against this result, defendant merely claims that, had this evidence been presented, "[t]he jury would have been more likely to believe [defendant's] testimony about [the decedent's] violent behavior backed by science." That is highly unlikely given that, at most, Dr. Shiener would testify that one potential side effect of the decedent's seizure medication was aggression, and Dr.

-8-

Shiener would have to concede that he did not know if the decedent's medication actually made him more aggressive. More broadly, defendant would be up against the fact that there was *no* evidence that the decedent's seizure medication had resulted in his becoming aggressive on any previous occasion. While defendant testified at trial that the decedent's medication affected the decedent's mood, she did not say that it made him aggressive, and two of the decedent's family members testified that the decedent's medication made him sleepy. Against this backdrop, it is simply not reasonably probable that, had defendant presented evidence that a possible side effect of the decedent's seizure medication when mixed with alcohol was aggression, the result of her trial would have been different.

## F. MANSLAUGHTER INSTRUCTION

Defendant next contends that the trial court erred by reasoning that it was objectively reasonable for Taylor to not request a manslaughter instruction. We disagree.

Taylor testified that he had considered requesting a manslaughter instruction, discussed requesting a manslaughter instruction with defendant "in depth on a number of occasions," and defendant "absolutely said no." Taylor clarified that he walked defendant through the elements of voluntary manslaughter, told defendant that she would be facing life imprisonment if the jury found her guilty of first-degree murder, and advised defendant that the jury could compromise and find that "the voluntary manslaughter charge [was] a plausible alternative" to her self-defense theory, but defendant was "unequivocally set" on not requesting the manslaughter instruction.

Taylor also agreed that, based on Taylor's experience, giving the jury an alternative charge like voluntary manslaughter increased the likelihood of a compromise verdict that would still lead to a conviction. Taylor further agreed that the decision to not ask for the manslaughter instruction was part of the all-or-nothing strategy that defendant wanted. Taylor acknowledged that the trial court gave a second-degree-murder instruction but clarified that he did not request the instruction. Taylor said that the inclusion of this instruction did not change Taylor's advice to defendant—he continued to advise her that the manslaughter instruction was available and she continued to "not want the manslaughter charge included." Taylor clarified that he explicitly told defendant that the second-degree murder charge would be instructed at her trial.

Based on Taylor's testimony, his decision to not request a voluntary manslaughter instruction was objectively reasonable. Taylor was plainly employing an all-or-nothing defense— the defense was seeking an acquittal of all charges and trying to avoid a compromise verdict.[7] An all-or-nothing defense is "a legitimate trial strategy," and "[w]hen the defense's trial strategy is to obtain an outright acquittal, an instruction or argument on a lesser offense may reduce the defendant's chance of acquittal." *People v Allen*, 331 Mich App 587, 610; 953 NW2d 460 (2020), vacated in part on other grounds 507 Mich 856 (2021). See also *People v Robinson*, 154 Mich

---

[7] The trial court reasoned that Taylor was not pursuing an all-or-nothing defense because the trial court instructed the jury on second-degree murder. Yet even with the second-degree murder instruction (which Taylor did not request), the defense continued to seek an acquittal of all charges based on a theory of self-defense, i.e., Taylor continued pursuing an all-or-nothing defense.

App 92, 94; 397 NW2d 229 (1986) ("[T]he decision not to request lesser offenses was a matter of trial strategy."); *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982) (holding that defense counsel was not ineffective by failing to request a lesser-included-offense instruction because "[t]he decision to proceed with an all or nothing defense is a legitimate trial strategy"). At the *Ginther* hearing, Taylor agreed that, based on his experience, giving the jury a lesser-included instruction like voluntary manslaughter could increase the likelihood of a compromise verdict, making the chances of an acquittal less likely. Taylor's decision to not request a manslaughter instruction was thus consistent with the defense's all-or-nothing strategy. This Court does not substitute its judgment for that of counsel on matters of trial strategy. *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015).

Defendant insists that Taylor's performance was objectively unreasonable for a variety of reasons. First, defendant contends that Taylor failed to adequately advise defendant about a manslaughter defense, including failing to explain how her case "fit the legal definition of manslaughter" and failing to advise defendant "about the much lower sentencing exposure for manslaughter." These claims are either unsupported or directly contradicted by the record. Taylor testified that he discussed requesting a manslaughter instruction at length with defendant, including walking defendant through the elements of manslaughter and how a jury could find manslaughter to be "a plausible alternative" if it rejected defendant's self-defense theory. While Taylor did not specifically say that he explained the penalty for manslaughter to defendant, he was never asked that question.[8] He did say, however, that he discussed requesting a manslaughter instruction with defendant "in depth on a number of occasions," and that defendant was "unequivocally set" on not requesting the instruction. On this record, we cannot conclude that Taylor's performance was objectively unreasonable.

Defendant alternatively argues that Taylor's performance was unreasonable because "he deferred to" defendant when deciding not to request the voluntary manslaughter instruction. This claim is also not borne out by the record. Taylor did say that defendant was "unequivocally set" on not requesting the voluntary manslaughter instruction, but Taylor also explained that not requesting a voluntary manslaughter instruction was consistent with the defense's all-or-nothing strategy because requesting an alternative instruction like manslaughter increased the likelihood of a compromise verdict. This evidences that Taylor did not abdicate his role as defendant's counsel but instead took her requests into account, then employed a reasonable trial strategy consistent with her wishes.

Additionally, Taylor's adhering to defendant's request was, itself, trial strategy. Defense counsel is most effective when they have a good relationship with their client, and doing as the client requests is one way to ensure a healthy relationship. Taylor sensibly employed a reasonable

---

[8] Defendant testified that Taylor did not explain to her the different penalties for the different offenses, but the trial court found defendant's testimony not credible. "This Court defers to the trial court's superior position to evaluate the credibility of witnesses who testified before it." *People v White*, 331 Mich App 144, 150; 951 NW2d 106 (2020).

-10-

trial strategy that also maintained his relationship with defendant, which supports that Taylor's decision to not request a manslaughter instruction was objectively reasonable.

Defendant insists that this case is like *People v Yeager*, 511 Mich 478, 490-494; 999 NW2d 490 (2023), in which our Supreme Court held that it was objectively unreasonable for the defendant's trial counsel to not request a voluntary manslaughter instruction. There, as explained by the Supreme Court, a rational view of the evidence supported a voluntary manslaughter instruction, but, as evidenced by the defendant's trial counsel's testimony at a *Ginther* hearing, trial counsel chose not to request the instruction based on his "misunderstanding of the law." *Id*. at 490-491, 494.

The trial court here rightly distinguished this case from *Yeager* by reasoning that Taylor's decision to not request a manslaughter instruction was not based on a misunderstanding of the law but on his conversations with defendant and his belief that requesting such an instruction "would weaken their defense." Defendant contends that this reasoning was erroneous because "*Yeager* does not stand for the idea that it can only be a mistake in law that makes failing to ask for the instruction unreasonable." The trial court plainly did not claim that *Yeager* stood for this proposition. Rather, the trial court accurately distinguished this case from *Yeager* by observing the obvious factual differences between the two, then it reiterated its reasoning for why Taylor's decision to not request a manslaughter instruction was objectively reasonable under the circumstances. We agree with the trial court that this case is distinguishable from *Yeager* and that Taylor's decision to not request a voluntary manslaughter instruction was objectively reasonable.[9]

### III. MRE 404(B)

---

[9] In her supplemental brief on appeal, defendant raises a cumulative-error argument, contending that "the cumulative effect of trial counsel's errors denied her the right to effective assistance of counsel and the right to a fair trial." This argument is not properly before this Court. Defendant did not raise this issue in her motion for remand, and this Court's remand order limited the proceedings on remand "to the issues raised in the motion to remand." *Talley*, unpub ord. The same order permitted defendant to file a supplemental brief in this Court similarly limited "to the issues raised on remand." *Id*. This did not allow defendant to raise additional issues in her supplemental brief because "the issues raised on remand" were limited "to the issues raised in the motion to remand." *Id*. But even if it did permit defendant to raise additional issues, it is not apparent that she raised a cumulative-error argument before the trial court during the remand proceedings because the trial court did not address such an argument in its opinion on remand.

Regardless, substantively, defendant's the cumulative-error argument does not merit appellate relief. The only potential errors by trial counsel that defendant has identified were counsel's failures to consult a ballistics expert and a medical expert about the potential effects of the decedent's medications when mixed with alcohol. For the reasons explained in this opinion, neither issue came close to the type of prejudice that defendant must establish to be entitled to a new trial. When the errors are considered together, that conclusion remains the same.

-11-

Defendant next challenges the trial court's decision to allow Duhart's testimony about defendant's other bad acts under MRE 404(b).


## A. STANDARD OF REVIEW

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Buie*, 491 Mich 294, 320; 817 NW2d 33 (2012).

## B. LAW AND ANALYSIS

Before trial, the prosecution filed a notice of intent to present evidence of other acts by defendant through the testimony of Duhart. The prosecution claimed that its purpose in introducing the evidence was to establish defendant's intent and that she had a common plan or scheme. Defendant objected, and the trial court held a hearing on the objection.

After listening to the parties' arguments, the trial court held that evidence of defendant's assault of Duhart was admissible under MRE 404(b). The court first addressed whether the evidence was being admitted for a proper purpose, and concluded that it was because it was being admitted to show "what the defendant's intent was" and to rebut defendant's claim of self-defense. The court next addressed whether the prior assault was logically relevant to these purposes. To make this determination, the court looked to the similarities between the two assaults. The court observed that, for the past assault, defendant was in a relationship with the victim, and she assaulted Duhart while he was in a vulnerable state. This, the court explained, was similar to the prosecution's theory for this case—that defendant assaulted the decedent while he was "sitting there on the couch, not advancing any threat to [defendant]." The prosecution's theory was supported by, among other things, the partially-full, uncapped water bottle that was found between the decedent's legs, suggesting that the decedent was sitting down when he was shot and undermining defendant's claim that there was a struggle in which she killed the decedent in self-defense. The court also opined that the two cases were similar because defendant justified her actions in both instances by blaming the victim that she assaulted. The court next concluded that the evidence's probative value was not substantially outweighed by the danger of unfair prejudice, and said that it would give a limiting instruction to the jury to further prevent the danger of unfair prejudice. The court accordingly overruled defendant's objection to the prosecution's MRE 404(b) evidence.

As relevant to this case, the admission of other-acts evidence is governed by MRE 404(b). At the relevant time, that rule provided:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or

absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case. [MRE 404(b)(1).]

In *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994), our Supreme Court articulated the following four-part test for lower courts to apply when determining whether other-acts evidence is admissible under MRE 404(b)(1):

First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury.

## 1. PROPER PURPOSE

On appeal, defendant does not contest that Duhart's testimony was admitted for a proper purpose, meaning that it satisfies the first part of the *VanderVliet* test. The prosecution claimed that it was submitting Duhart's testimony to prove defendant's intent in killing the decedent, and to prove that her actions were consistent with a common scheme or plan. The trial court admitted the evidence for these purposes, which were plainly proper. See MRE 404(b)(1).

## 2. LOGICAL RELEVANCE

The next question is whether the other-acts evidence was logically relevant to these stated purposes. Evidence is logically relevant if it is material and probative. *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998). Evidence is material if it is related to a fact that is of consequence to the action. *Id*. at 388-389. "[T]he elements of the offense are always 'in issue' and, thus, material." *Id*. at 389. Additionally, because defendant here claimed self-defense, the prosecution had the burden of disproving that claim beyond a reasonable doubt. *People v Denson*, 500 Mich 385, 399; 902 NW2d 306 (2017). When other-acts evidence is admitted to rebut a claim of self-defense, it is "best understood as an attempt to rebut a defendant's claimed state of mind, that is, to show that a defendant did not have an honest and reasonable belief that his or her use of force was necessary to defend himself or herself or another." *Id*.

The dispute in this case centered around defendant's intent—defendant did not contest the fact that she killed the decedent. Defendant contended that she killed the decedent in self-defense, while the prosecution contended that the killing was premeditated. The two theories of intent relied on two different factual bases for defendant's killing of the decedent. Defendant claimed that the decedent pointed a gun at her, that she grabbed the gun and was able to wrestle it away from the decedent, and that she only shot the decedent when he lunged at her after she wrestled the gun from him. The prosecution, on the other hand, claimed that, while the decedent was sitting on the couch, defendant went to their shared bedroom, grabbed the gun from the dresser drawer, racked the gun to make sure it was loaded (leaving an unspent cartridge on the floor of the bedroom), then went to living room and shot the decedent while he sat on the couch. It follows that both defendant's intent and the circumstances surrounding her shooting of the decedent were "in issue" and, thus, material. *Crawford*, 458 Mich at 389.

-13-

The crux of the dispute in the trial court and on appeal was whether defendant's assault of Duhart was probative of either of those material facts in issue. As *Crawford* explains:

> The probative force inquiry asks whether the proffered evidence tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The threshold is minimal: "any" tendency is sufficient probative force. MRE 401. In the context of prior acts evidence, however, MRE 404(b) stands as a sentinel at the gate: the proffered evidence truly must be probative of something *other* than the defendant's propensity to commit the crime. If the prosecutor fails to weave a logical thread linking the prior act to the ultimate inference, the evidence must be excluded, notwithstanding its logical relevance to character. [*Crawford*, 458 Mich at 389-390 (quotation marks and citations omitted.)]

While other-acts evidence can be used to establish both (1) a defendant's intent and (2) that the defendant acted in accordance with a common plan or scheme, each theory of relevance is probative to a different non-propensity intermediate inference. In *Crawford*, our Supreme Court explained how a defendant's past conduct could be relevant to proving a defendant's intent under the doctrine of chances "on the premise that the more often the defendant commits an actus reus, the less is the likelihood that the defendant acted accidentally or innocently." *Id*. at 393 (quotation marks and citation omitted.) When other-acts evidence is submitted under this theory of relevance, "[t]he intermediate inference is an objective likelihood under the doctrine of chances rather than a subjective probability based on the defendant's character." *Id*. at 394 (quotation marks and citation omitted.) In *People v Sabin*, 463 Mich 43, 64 n 10; 614 NW2d 888 (2000), our Supreme Court explained how evidence that the defendant acted in accordance with a common plan or scheme could be used as proof that the charged conduct occurred using a different intermediate inference:

> [T]he jury is asked to infer the existence of a common system and consider evidence that the defendant used that system in committing the charged act as proof that the charged act occurred. The logical relevance of the evidence is based on the system, as shown through the similarities between the charged and uncharged acts, rather than on defendant's character, as shown by the uncharged act.

In *Denson*, 500 Mich at 403, our Supreme Court warned that, if the prosecution's theory of relevance hinges on the "alleged similarity between a defendant's other act and the charged offense," then a "striking similarity" between the acts is required. But, as the Court explained elsewhere, "Different theories of relevance require different degrees of similarity between past acts and the charged offense to warrant admission." *People v Mardlin*, 487 Mich 609, 622; 790 NW2d 607 (2010). For instance, when the other-acts evidence is "offered to show intent, logical relevance dictates only that the charged crime and the proffered other acts 'are of the same general category.' " *VanderVliet*, 444 Mich. at 79-80 (citation omitted). See also *People v Galloway*, 335 Mich App 629, 640; 967 NW2d 908 (2020).

Here, the prosecution has always argued that the other-acts evidence was relevant based on its similarity to the charged offense. More specifically, the prosecution argued that the other-acts evidence supported that defendant did not act in self-defense when she shot the decedent, and that

her actions were in fact premeditated, because they were so similar to her assault of Duhart. The trial court agreed.

The trial court did not abuse its discretion by admitting the other-acts evidence to prove defendant's intent and that she acted in accordance with a common plan or scheme when she shot the decedent because defendant's assault of Duhart bore the requisite "striking similarity" to her shooting of the decedent to be admissible under either theory of relevance. Defendant was romantically involved with both victims; both victims were in a vulnerable state when defendant attacked them[10]; defendant used a dangerous weapon both times; and, after committing each assault, defendant claimed that she had been attacked by the victim first. Given these similarities, defendant's assault of Duhart was relevant to proving that defendant's killing of the decedent was premeditated and not in self-defense—the similarities suggest that defendant had a common system or plan of using her position of trust with a romantic partner to wait until they were in a vulnerable state, then attack them with a weapon while they were in that vulnerable state and unable to defend themselves, and claim afterwards that the victim attacked her first.

Defendant contends on appeal that the prosecution's other-acts evidence was not strikingly similar to the charged conduct, and relies principally on *Denson*, 500 Mich 385, in support of her argument. That case is simply not similar to this one. There, the two assaults involved "completely different scenario[s]"—in one, the defendant assaulted a young man after finding the young man in a room with the defendant's daughter, and defendant claimed afterwards that he assaulted the young man because the young man was sexually assaulting the defendant's daughter; while in the other, the defendant assaulted someone over a supposed drug debt. *Id.* at 406-408. In *Denson*, unlike here, there was no similarity in the defendant's relationship with each victim, no similarity in the manner in which the defendant allegedly assaulted each victim, and no similarity between the defendant's actions following each assault.

That is not to say that defendant's assault of Duhart and her shooting of the decedent were identical; the two assaults had dissimilarities. For instance, defendant had known Duhart for a short amount of time and they had only talked occasionally before she assaulted him, while she had known the decedent and lived with him for well over a year before shooting him. Defendant also used a different weapon in each case—she hit Duhart with a brick while she shot the decedent with a gun. She also did not claim self-defense after she attacked Duhart (although she did justify her actions by claiming that Duhart raped her). Finally, defendant assaulted Duhart approximately seven years before she shot the decedent. Accord *People v Yost*, 278 Mich App 341, 405; 749 NW2d 753 (2008) ("Although there is no time limit applicable to the admissibility of other acts evidence, see MRE 404(b), the remoteness in time between the charged conduct and the more serious allegations of physical abuse limits the logical relevance of these other acts to show intent.").

---

[10] This requires accepting the prosecution's theory that defendant attacked the decedent while he was falling asleep seated on the couch. As will be explained later, the prosecution's theory was a reasonable inference based on the evidence.

In light of these differences, this case "is one in which reasonable persons could disagree on whether the charged and uncharged acts contained sufficient common features to infer the existence of a common system used by defendant in committing the acts." *Sabin*, 463 Mich at 67. But "the trial court's decision on a close evidentiary question such as this one ordinarily cannot be an abuse of discretion." *Id*. We therefore conclude that, while a close call, the trial court did not abuse its discretion by concluding that the other-acts evidence was logically relevant to establishing both defendant's intent and that defendant acted in accordance with a common scheme when she shot the decedent. See *id*.

### 3. MRE 403

For the third part of the *VanderVliet* test, courts "should employ the balancing process under Rule 403." *VanderVliet*, 444 Mich at 74-75. MRE 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." All evidence submitted by the prosecution is "presumably . . . prejudicial [to the defendant] because it attempt[s] to prove that [the] defendant committed the crime." *People v Pickens*, 446 Mich 298, 336-337; 521 NW2d 797 (1994). But MRE 403 does not exclude all prejudicial evidence, only *unfairly* prejudicial evidence. *Pickens*, 446 Mich at 336-337. Evidence is unfairly prejudicial if it has a tendency "to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Id*. at 337. "The trial court is in the best position to make MRE 403 determinations on the basis of a contemporaneous assessment of the presentation, credibility, and effect of testimony." *Mardlin*, 487 Mich at 627 (quotation marks, citation, and alteration omitted).

Duhart's other-acts testimony was probative for the reasons explained in the previous section. This evidence, like all of the prosecution's evidence, was prejudicial to defendant. *Pickens*, 446 Mich at 336-337. Defendant contends that the evidence was *unfairly* prejudicial because it "only served to paint [defendant] as a violent person who had the propensity to harm" the decedent. If that was indeed the evidence's only purpose, then it would be unfairly prejudicial, see *Crawford*, 458 Mich at 398, but the evidence served other purposes as explained in the previous section. Namely, the evidence was probative to proving defendant's intent and that she acted in accordance with a common plan or scheme when she shot defendant. As also explained in the previous section, the other-acts evidence tended to prove these material facts by relying on non-propensity intermediate inferences.

Still, defendant is correct to the extent that there was a possibility that the jury could rely on the other-acts evidence to make improper inferences about defendant's character. But that concern was addressed by the limiting instruction that the trial court gave to jurors. That instruction was consistent with the fourth part of the *VanderVliet* test, and jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). To any extent that there was still a lingering danger of unfair prejudice, relevant evidence is only inadmissible under MRE 403 if its probative value is *substantially* outweighed by the danger of unfair prejudice. Given this, and considering the probative value of the other-acts evidence against the risk of unfair prejudice to defendant (as minimized by the trial court's limiting instruction), we

must conclude that the trial court did not abuse its discretion when it ruled that the other-acts evidence was not barred by MRE 403.


## 4. OUTCOME DETERMINATIVE ERROR

Even if the trial court did err by admitting the other-acts evidence under MRE 404(b), the error would not have been outcome determinative in light of the overwhelming untainted physical evidence undermining defendant's theory of self-defense.

As explained by our Supreme Court, when evidence is admitted in violation of MRE 404(b), the error is subject to harmless-error review. *Denson*, 500 Mich at 409. "If the court's evidentiary error is nonconstitutional and preserved, then it is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) (quotation marks and citation omitted). The focus of this review is "on the nature of the error," and it is assessed "in light of the weight and strength of the untainted evidence." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (quotation marks and citation omitted).

There was no dispute that defendant shot the decedent. The dispute in this case centered around the circumstances surrounding the shooting. Defendant contended that she killed the decedent in self-defense. She testified that the decedent pointed a gun at her, which caused her to grab the gun, a physical struggle ensued, and she was able to wrestle the gun away from the decedent. She claimed that the decedent then lunged at her, and she was forced to shoot him.

Little if any of the untainted physical evidence supported this theory. Deputy Ruben Garcia, an experienced police officer who had responded to "thousands and thousands" of assault calls, testified that, based on his experience, he did not see any signs of a struggle at the scene of the decedent's death. Dr. Pacris testified that there was no evidence of soot or stippling on the decedent, which suggested that he was shot from more than two feet away. Deputy Charlton testified that the placement of the spent cartridges and the trajectory of the gunshot entrance wounds were consistent with the shooter standing away from the decedent. And, perhaps most detrimental to defendant's claim of self-defense, there was a partially-filled, uncapped water bottle between the decedent's legs, but none of the areas around the water bottle were wet, suggesting that the water bottle had not spilled during the course of the shooting. Multiple witnesses testified to having observed the uncapped water bottle and investigated the area around the water bottle to see if any areas were wet, and the testimony was unanimous that the areas were dry. A photo of the decedent sitting with gunshot wounds to his chest and the partially-full, uncapped water bottle between his legs was admitted into evidence. All of this untainted physical evidence undermined

-17-

defendant's theory of self-defense and supported the prosecution's theory that defendant (who admitted to the shooting) murdered the decedent.[11]

Considering the overwhelming weight and strength of the untainted physical evidence supporting the prosecution's theory of the case and undermining defendant's claim of self-defense, any error in the admission of the other-acts evidence was harmless.

## IV. PROSECUTORIAL MISCONDUCT

Defendant next contends that the prosecutor deprived defendant of a fair trial when he repeatedly stated during closing arguments that the decedent was "asleep" or "dozing off" when defendant shot him. We disagree.

## A. STANDARD OF REVIEW

Defendant failed to preserve this claim, and unpreserved claims are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish plain error, the defendant must show that (1) error occurred, (2) the error was clear or obvious, and (3) the error affected defendant's substantial rights, which generally requires showing that the error affected the outcome of the lower court proceedings. *Id*. To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018).

## B. LAW AND ANALYSIS

The test for prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Issues of prosecutorial error are analyzed "on a case-by-case basis, reviewing the prosecutor's comments in context and in light of the defendant's arguments." *Lane*, 308 Mich App at 62-63. See also *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

"A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). See also *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). "The

---

[11] Defendant's credibility was also seriously undermined. She claimed that the decedent attacked her in part because he was drinking all day, but his blood alcohol content at the time of death was only .02. She also claimed that the decedent told her that he had repeated run-ins with police due to his violent nature, but the prosecution's rebuttal witness testified that there was no record of the decedent having any interactions with police—not even a traffic stop.

prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66.

Defendant is correct to the extent that she argues that there was no direct evidence to support the prosecutor's assertions during closing arguments that the decedent was "asleep" or "dozing off" when he was shot. There was, however, sufficient circumstantial evidence from which the prosecutor could reasonably infer that the decedent was indeed "dozing off" or asleep when he was shot by defendant.

First, the shooting occurred late at night, shortly before midnight. Second, the decedent had consumed alcohol at some point before the shooting, as evidenced by his blood alcohol level. Third, the decedent was known to take epilepsy medication that made him sleepy, and the decedent's family members testified that the decedent was fairly consistent with taking his medications.[12] Fourth, Deputy Garcia testified that, based on his experience responding to "thousands and thousands" of assault calls, he did not see any sign of a struggle. Fifth, the downward trajectory of the decedent's gunshot wounds, as testified to by Dr. Pacris, supports that the victim was shot while seated. Sixth, the decedent was found in a seated position on the couch when officers arrived. Finally, a partially-full, uncapped water bottle was found between the decedent's legs, and none of the areas around the water bottle were wet, suggesting that the water bottle had not spilled despite the shooting.

Taken together, this circumstantial evidence strongly suggests that the decedent was shot while sitting, and that the shooting occurred while he was so unaware that—despite being shot 11 times—he did move enough to spill the partially-filled, uncapped water bottle between his legs. And if the decedent moved very little despite being shot 11 times, in conjunction with the time of night that the shooting occurred, the decedent's epilepsy medication that made him sleepy, and the alcohol found in the decedent's system, it was reasonable for the prosecutor to infer that the decedent was "dozing off" or asleep when defendant shot him. This is especially true because it is well-established that prosecutors are granted wide latitude when arguing reasonable inferences from the evidence as they relate to the prosecutor's theory of the case. *Dobek*, 274 Mich App at 66. Accordingly, the prosecutor's contested assertions made during closing did not rise to the level of prosecutorial misconduct because the assertions were reasonable inferences based on the evidence.[13]

## V. "ANONYMOUS" JURY

---

[12] Although Dr. Pacris testified that there were no drugs found in the decedent's body besides alcohol, as this Court previously stated, "[C]onsidering the trial testimony that [the decedent] regularly took his medication, it is reasonable to infer that he did so on May 11, 2018." *Talley*, unpub op at 4.

[13] Defendant alternatively argues that her trial counsel was ineffective for not objecting to the prosecutor's closing argument, but a trial counsel's failure to raise a meritless argument does not constitute ineffective assistance. See *Ericksen*, 288 Mich App at 201.

Defendant next argues that the trial court plainly erred by empaneling an "anonymous" jury. This claim of error is meritless.

## A. STANDARD OF REVIEW

This unpreserved claim of error is reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763. To establish plain error, the defendant must show that (1) error occurred, (2) the error was clear or obvious, and (3) the error affected defendant's substantial rights, which generally requires showing that the error affected the outcome of the lower court proceedings. *Id*.

## B. LAW AND ANALYSIS

Despite arguing that the trial court here empaneled an "anonymous jury," defendant never explains what she means by that term. In *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000), this Court explained, "An 'anonymous jury' is one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." See also *People v Hanks*, 276 Mich App 91, 93; 740 NW2d 530 (2007) (confirming this definition of an "anonymous jury"). Defendant does not identify any information that was withheld from the parties. This is problematic because, as this Court explained in *Williams*, "In order to successfully challenge the use of an 'anonymous jury,' the record must reflect that the parties have had information withheld from them, thus preventing meaningful voir dire, or that the presumption of innocence has been compromised." *Williams*, 241 Mich App at 523. Because defendant has not identified any information withheld from the parties, defendant has not established that the trial court empaneled an "anonymous jury," let alone that the court plainly erred by doing so. See *Hanks*, 276 Mich App at 94 (holding that the defendant failed to establish plain error when the trial court referred to jurors by numbers instead of their names because "none of the dangers of an 'anonymous jury' was implicated").

Still, the trial court did not refer to jurors by their names on the record, but instead referred to jurors by numbers, and once seated, referred to the jurors by either their juror number or seat number. But as this Court in *Williams* explained, in circumstances like these, an "anonymous jury" was not empaneled "in the strict sense of the term." *Williams*, 241 Mich App at 523. See also *Hanks*, 276 Mich App at 94.

Even looking to the caselaw cited by defendant, it remains unclear why defendant believes that the trial court here empaneled an "anonymous jury." The federal cases that she principally relies on certainly do not support that contention. Defendant cites *United States v Thomas*, 757 F2d 1359, 1362 (CA 2, 1985), and *United States v Ross*, 33 F3d 1507, 1519 (CA 11, 1994), where the juries were considered anonymous because the court ordered that the jurors' names, addresses, and places of employment not be disclosed during voir dire.

Here, nothing in the record suggests that jurors' names, addresses, or occupations were withheld from the parties. There is certainly no order in the lower court file or ruling from the

bench in which the trial court ordered this information withheld. While there is little evidence in the record to suggest that this information *was* given to the parties, it appears that some information about jurors was indeed furnished to the parties before voir dire because the prosecutor at one point referred to the parties' "cheat sheet."[14] Additionally, the parties freely asked jurors about their place of employment and where their relatives were employed. The available record thus readily belies defendant's assertion that the trial court empaneled an "anonymous jury" as that term is generally understood, either in this state's caselaw or in the federal caselaw relied on by defendant.

Defendant cites one out-of-state case in which the Wisconsin Supreme Court said that a jury was "anonymous" where the parties had all of the jurors' information but the trial court referred to the jurors by number instead of name. *State v Tucker*, 259 Wis 2d 484, 493 (2003). The *Tucker* Court was clear, however, that its reference to the jury as "anonymous" was somewhat of a misnomer because "[a] jury is typically deemed 'anonymous' when juror information is withheld from the public and the parties themselves." *Id*. The Court clarified that it was still going to refer to the jury as an "anonymous" jury instead of a "numbers" jury because "the reasoning in cases involving anonymous juries [was] beneficial to [its] analysis." *Id*. The *Tucker* Court ultimately held that any time juror information is withheld, a court "must both: (1) find that a jury needs protection; and (2) take reasonable precautions to avoid prejudicing the defendant." *Id*. at 498. Notably, however, defendant does not principally rely on *Tucker* or the test announced in *Tucker*, and actually disagrees with *Tucker* in a significant way—*Tucker* held that empaneling a "numbers" jury was subject to harmless-error review, see *id*. at 501, while defendant contends that this should be considered a structural error.

At any rate, *Tucker* is not binding on this Court, while *Williams* is. This Court in *Williams* held that using numbers to refer to jurors did not undermine the presumption of innocence absent evidence of prejudice to the defendant. *Williams*, 241 Mich App at 524. This holding is in direct conflict with the holding from *Tucker*, and this Court is bound by *Williams*. MCR 7.215(C)(2). See also *Hanks*, 276 Mich App at 95 (recognizing *Tucker* but rejecting its reasoning because the *Hank* Court was "not persuaded that *Williams* was wrongly decided"). Defendant has not offered any explanation for how she was prejudiced by the trial court's using numbers to refer to jurors.

In light of the foregoing, defendant's anonymous-jury argument wholly lacks merit.

## VI. STANDARD 4 BRIEF

In a Standard 4 brief, defendant raises an additional seven issues on appeal. We address each issue in turn.

Defendant first takes issue with the fact that the jury heard about her assault of a prison employee during the prosecution's cross-examination of defendant. Defendant argues that this constituted inadmissible other-acts evidence in violation of MRE 404(b), that the prosecution's

---

[14] Presumably, this "cheat sheet" refers to the questionnaire that jurors are required to complete and attorneys are entitled to review. See MCR 2.510.

questioning amounted to prosecutorial misconduct, and that her trial counsel was ineffective for not objecting to the improper evidence and questioning.

Before addressing this argument, it is necessary to explain the context of the contested testimony. During his cross-examination of defendant, the prosecutor asked defendant why she would sign letters as "Queenie Combs" and "Sean Combs." Defendant's response was long, during which she mentioned that she signed her letters this way while she was "incarcerated in the penitentiary." The prosecutor followed up by asking, "Now, you said you were incarcerated. Was that for the assault of Mr. Duhart?" Defendant responded:

> I was incarcerated for an assault. While I was in Oakland County Jail, I had been assaulted and—while I was here for the charge of Mr. Duhart, I was assaulted, and during that time, after I started going to court and got everything taken care of with Mr. Duhart, I saw the officer who assaulted me and I retaliated. That's how I ended up doing a five-year term in prison for assault on a prison employee.

The prosecutor then asked defendant what she meant by saying that she "retaliated against an officer" that assaulted her, and there was a back-and-forth between defendant and the prosecutor in which defendant clarified that, while she "retaliated" against the officer, she was "still defending" herself. Defendant's assault of a prison employee was not mentioned again.

Defendant's arguments related to this testimony do not merit relief. An unresponsive answer to a proper question is not a basis for granting a new trial. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). And it is not improper for a prosecutor to ask about prior bad acts if the defendant opens the door to the question. *People v Horn*, 279 Mich App 31, 35-36; 755 NW2d 212 (2008).

Defendant's initial statement about being "incarcerated" when she signed her name as "Queenie Combs" was unresponsive to the prosecution's question about why she signed her name that way. Despite being unresponsive, defendant's answer opened the door for the prosecutor to ask for clarification about whether defendant was referring to being incarcerated for assaulting Duhart, which the jury already knew about. Defendant answered with more unresponsive testimony in which she volunteered that, while she was incarcerated for assaulting Duhart, she "retaliated" against a prison employee and had to do additional time for "assault on a prison employee." This opened the door for the prosecutor to ask defendant what she meant by saying that she assaulted the prison employee in "retaliation." Because unresponsive answers to proper questions are not a basis for granting a new trial, *Haywood*, 209 Mich App at 228, and because it is not improper for a prosecutor to ask about prior bad acts if the defendant opens the door, *Horn*, 279 Mich App at 35-36, defendant has not identified an error in the lower court proceedings, and Taylor was not ineffective for failing to raise a futile objection, *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015).

Defendant next argues that Taylor was ineffective for failing to call an expert in rape trauma syndrome. For this ineffective-assistance claim to proceed, defendant first needs to establish that she had been diagnosed or experienced the effects of rape trauma syndrome. Defendant does not point to any evidence in the record suggesting that she had been diagnosed with rape trauma syndrome, nor does she provide an affidavit from an expert suggesting that

defendant had been diagnosed with, or was even a candidate to be diagnosed with, the syndrome. Without such evidence, defendant has failed to establish the factual predicate of her claim. *Haynes*, 338 Mich App at 430. Defendant also does not explain how testimony about rape trauma syndrome would have made it more likely that the jury would believe her claim of self-defense. In the absence of such an explanation, there is no basis to conclude that the failure to call an expert in rape trauma syndrome prejudiced defendant. See *id*.

The third issue in defendant's Standard 4 brief alleges judicial misconduct by the trial court, but her argument is hard to follow. She claims that the trial judge committed misconduct because he allowed the prosecutor to ask about a "major record deal with [a] hip hop label" and "Mr. Sean Combs" rather than asking defendant about a "major modeling deal with [a] major modeling agency." Defendant elaborates that the trial judge's "fail[ure] to allow objection" to the testimony about Sean Combs[15] "allowed [the trial judge] and prosecution the prestige of office to advance personal business interests." This argument is indecipherable, so we consider it abandoned. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001).

Defendant next claims that Taylor was ineffective for allowing defendant to testify rather than invoking her right to remain silent. This claim lacks merit. Before defendant testified, Taylor[16] asked defendant if she understood that she had "an absolute right not to testify," and she confirmed that she did. Defendant then affirmatively waived her right to remain silent, and confirmed that she was doing so voluntarily. It is thus clear from the record that Taylor ensured that defendant understood her right to remain silent before she took the stand, and that defendant's decision to testify was her choice alone. It was also objectively reasonable for defendant to testify. There was no question that defendant shot the decedent. The jury was only considering the circumstances surrounding the shooting. Defendant asserted a claim of self-defense, but little if any of the physical evidence supported that claim. So, the only way for the jury to hear the basis for defendant's claim of self-defense was for her to take the stand. In light of the foregoing, there is simply no basis to conclude that Taylor provided ineffective assistance by allowing defendant to testify under these circumstances.

The fifth issue raised in defendant's Standard 4 brief relates to Deputy Garcia's testimony. Defendant argues that Deputy Garcia's testimony that he saw no signs of a struggle was improper because photos and other evidence from the crime scene "show otherwise than what he testified about the evidence." Even if this was true, it does not go to the admissibility of Deputy Garcia's testimony but its weight, which is an issue for the jury, as the fact-finder. See *People v Copeland*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 363925); slip op at 8. Defendant also repeatedly states that Deputy Garcia was an "expert," which is incorrect. Deputy Garcia was never qualified as an expert. Deputy Garcia's testimony that he did not see any signs of a struggle

---

[15] Taylor never objected to this testimony, and nothing in the record suggests that the trial court prevented counsel from raising objections.

[16] The transcript indicates that this questioning was conducted by the prosecutor, but it is clear from the questions asked that defendant was questioned by Taylor. This is also confirmed by the trial court's follow-up questions.

was plainly opinion testimony based on his experience as a police officer, which was proper. MRE 701; *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994).

Defendant next raises a *Batson*[17] challenge. Defendant did not raise a *Batson* challenge in the trial court, however, so there is no record of the racial composition of the jurors who were peremptorily excused or empaneled. In *People v Jackson*, 313 Mich App 409, 430; 884 NW2d 297 (2015), this Court stated that "unless it is clear from the record that the prosecution is using its peremptory challenges in a discriminatory fashion, a defendant who fails to raise the issue or otherwise develop an adequate record of objections forfeits appellate review of the issue." (Quotation marks and citation omitted.) Given that there is no record of the racial composition of the jurors who were excused, there is nothing in the record to suggest that any jurors were removed because of their race. Thus, as in *Jackson*, defendant has not established the factual predicate of her claim. See *Jackson*, 313 Mich App at 431.

For her final issue, defendant argues that the prosecutor and officers investigating this case denied defendant due process by "tampering" and falsifying evidence. This claim wholly lacks merit. Nothing in the record even begins to suggest that officers or the prosecutor tampered with evidence, and instead of providing any evidence to support her allegations, defendant offers only specious argument. For instance, she claims that officers must have planted the water bottle between the decedent's legs because, if the water bottle had been there when she shot him, it would have spilled when he lunged at her. That the physical evidence contradicted defendant's version of events is not a basis for concluding that officers tampered or falsified evidence. At most, such an argument goes to the officer's credibility, which was a question for the jury. This claim of error accordingly lacks merit.

Affirmed.


/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro

---

[17] *Batson v. Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).